IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.*, BOBBY GARRISON, and RUDOLFO GAONA, JR., | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-07-1018 |
| CROWN ROOFING SERVICES, INC., RAY PALMER, R.D. CHATMON, USS ENGINEERING, LLC, and JAMEEL HATTAB, | § § § § § § | |
| Defendants. | § | |

MEMORANDUM AND ORDER

Pending are Defendant Crown Roofing Services, Inc.'s, Ray Palmer's, and R.D. Chatmon's Motion for Partial Dismissal (Document No. 78) of the United States's First Amended Complaint. After carefully considering the motion, response, and the applicable law, the Court concludes that the motion should be denied.

I. Background

The United States intervened in this *qui tam* action, originally filed against Crown Roofing Services, Inc. ("Crown"), USS Engineering, LLC ("USSE"), and Jameel Hattab ("Hattab"), and on December 10, 2010 filed its First Amended Complaint,[1] which named

---

[1] Document No. 68.

Ray Palmer ("Palmer") and R. D. Chatmon ("Chatmon") as additional Defendants.

In 2005, the National Aeronautics and Space Administration ("NASA"), an agency of the United States government, solicited bids from several prime contractors, including Crown, to repair roofs at NASA's Johnson Space Center. A contracting officer ultimately chose to whom to award the contracts, but the contracting officer's technical representatives ("COTRs") "provided technical input critical to determining whether award to the contractor was appropriate."[2] Hattab and Larry Shelmire were employed as COTRs. Unbeknownst to NASA, Hattab also owned USSE, a design and construction company. Ray Palmer ("Palmer") is the President and 50 percent shareholder of Crown, and also "personally [oversaw] the contracts as supervisor to the project manager."[3]

The Government alleges that Crown, Shelmire, Hattab, Palmer, and USSE agreed to scheme to manipulate NASA's competitive bid process: Hattab and Shelmire used their influence as COTRs to recommend Crown for various Master Contracts and recommended Crown's proposed modifications while administering those contracts; in return, Crown would provide USSE--Hattab's company--with lucrative contracts, and Hattab would split the proceeds from these

---

[2] Id. ¶ 16.

[3] Id. ¶ 19.

subcontracts with Shelmire. The First Amended Complaint alleges three executions of this scheme.

First, on July 15, 2005, Crown was awarded a task order on NASA JSC Building 16 for roofing work valued at around $845,000.[4] Shelmire was the COTR who recommended to NASA that it award the task order to Crown.[5] In November, 2005, Crown awarded a subcontract to USSE to perform quality control work on a contract that Crown had with another federal agency. Shelmire subsequently approved a modification to the July 15, 2005 NASA task order that compensated Crown for unforseen conditions but failed to credit the government for more than $160,000 in work that Crown failed to perform. After NASA terminated all of Crown's task orders in July 2007, it conducted a full inspection of Crown's work, which revealed that the modification to Building 16, "requested by Crown and approved by Shelmire, improperly reduced the amount of lightweight concrete to be removed and allowed replacement of the small amount of concrete that Crown did remove with a substandard material resulting in a lesser quality roof than bargained for by NASA."[6]

Second, on December 9, 2005, NASA awarded to Crown task orders on NASA JSC buildings 420, 422, and 9 North. Again, Shelmire recommended Crown. The total value of these task orders was

---

[4] Id. ¶ 30.

[5] Id.

[6] Id. ¶ 53.

3

approximately $287,000.[7] On December 26, 2005, Crown awarded subcontracts to USSE to perform design work on these same NASA buildings, totaling nearly $150,000. After NASA terminated the task orders, it discovered that the roofing designs Crown had provided (which were prepared by USSE) for these buildings were deficient.

Third, in May 2006, Crown was awarded task orders worth $1.9 million for JSC Buildings 13 and 15, based on Hattab's recommendations. On May 18, 2006, Crown awarded a contract in the amount of $195,000 to USSE to renovate Crown's Baytown headquarters. Crown also requested a variance from the specifica-tions for these task orders, which Hattab recommended. A subsequent inspection revealed that "the material variance that Crown requested and that Hattab issued with regard to Buildings 13 and 15, improperly eliminated the requirement to remove light weight concrete and rendered the buildings *unsafe* . . . ."[8]

The Government asserts claims against the original Defendants under the Anti-Kickback Act ("AKA"), False Claims Act, and, as well, common-law claims for fraud, breach of contract, unjust enrichment, and payment by mistake.[9] The Government in its Amended Complaint, also alleged fraudulent transfers of assets from Crown to Palmer and Chatmon in violation of the Federal Debt Collection Procedures Act,

---

[7] Id. ¶ 41.

[8] Id. ¶ 53 (emphasis in original).

[9] See Document No. 68 (Government's First Am. Complt.).

"FDCPA," 28 U.S.C. §§ 3304(b)(1)(A) and 3304(b)(1)(B).[10] Crown, Palmer, and Chatmon (the "Crown Defendants") move to dismiss Counts IV and V, violations of the Anti-Kickback Act, 41 U.S.C. §§ 53(1) and 53(2), and the quasi-contract counts of unjust enrichment (Count XIII) and payment by mistake (Count XIV).

## II. Legal Standard

Rule 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When a district court reviews the sufficiency of a complaint before it receives any evidence either by affidavit or admission, its task is inevitably a limited one. See Scheuer v. Rhodes, 94 S. Ct. 1683, 1686 (1974). The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff is entitled to offer evidence to support the claims. Id.

In considering a motion to dismiss under Rule 12(b)(6), the district court must construe the allegations in the complaint favorably to the pleader and must accept as true all well-pleaded facts in the complaint. See Lowrey v. Tex. A&M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997). To survive dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974

---

[10] The Government also adds Palmer to its False Claims Act, Anti-Kickback Act, Bribery under 18 U.S.C. § 201, inducement of breach of fiduciary duty, and common-law fraud claims.

5

(2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). While a complaint "does not need detailed factual allegations . . . [the] allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 127 S. Ct. at 1964-65 (citations and internal footnote omitted).

### III. Anti-Kickback Act

The Crown Defendants assert that the Government's claims under the AKA fail as a matter of law because "under the AKA, where payments are made between prime contractor and subcontractor in connection with the same contract, kickbacks can only go in one in one direction: to the prime contractor from its subcontractor or to a subcontractor from an equal or lower tier subcontractor."[11] In other words, the Crown Defendants assert that Crown and Palmer could not have provided a "kickback" to USSE in return for preferential treatment because USSE was merely a subcontractor, and therefore was in no position "to provide Crown with preferential treatment under the Master Contract."[12] The AKA provides the following:

---

[11] Document No. 78 at 6-7.

[12] Id. at 7.

6

>   It is prohibited for any person –
>
>   (1) to provide, attempt to provide, or offer to provide any kickback;
>
>   (2) to solicit, accept, or attempt to accept any kickback; or
>
>   (3) to include, directly or indirectly, the amount of any kickback prohibited by clause (1) or (2) in the contract price charged by a subcontractor to a prime contractor or a higher tier subcontractor or in the contract price charged by a prime contractor to the United States.

41 U.S.C. § 53. The term "kickback" means:

>   [A]ny money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

42 U.S.C. § 52(2).

The Crown Defendants' argument that the AKA only forbids payments going up the contractual chain finds no support in the broad language of the Act. "Congress substantially rewrote the [AKA] in 1986 with the express purpose of extending the scope of the statute to any commercial bribery occurring anywhere within the federal procurement system." United States v. Purdy, 144 F.3d 241, 244 (2d Cir. 1998). "The language of the amended statute lays bare this purpose." Id. It prohibits "any person" from paying "any kickback" to "any . . . subcontractor or subcontractor employee,"

"for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract." 41 U.S.C. §§ 52(2), 53. The 1986 Amendment defined "kickback" to include "any . . . thing of value" to "broaden the coverage of the Act." H.R. Rep. No. 99-964, at 11 (1986). The phrase "for the purpose of improperly obtaining . . . favorable treatment" was likewise "intended to expand the coverage of the [pre-1986] Act to kickbacks made in the Federal procurement process for *any* improper purpose." Id. (emphasis added). Nothing in the plain language of the statute prohibits kickbacks made from prime contractors to subcontractors. See Purdy, 144 F.3d at 244 (finding that the AKA "impose[s] liability on any person who makes a payment to any other person involved in the federal procurement process for the purpose of obtaining favorable treatment").

Other courts addressing similar arguments have refused to limit the scope of the AKA. In United States v. Dynamics Research Corp., Dynamics Research Corporation ("DRC") was an IT consultant company hired by the Air Force. No. 03cv11965-NG, 2008 WL 886035, at *2 (D. Mass. Mar. 31, 2008). Two of DRC's employees--Garber and Arguin--used their influence as consultants to steer contracts to their favored prime contractors in return for illicit payments. Id. at *1, *3-5. Some of these payments were made to a company owned by Arguin's wife, and were made to look like payments to a legitimate subcontractor. Id. at *3-4. DRC argued that "the AKA

does not apply here, because it is only applicable where an illicit payment is made by a subcontractor to a person or entity further up the 'contractual chain.'" Id. at *18. The court rejected this argument and found "the language of the AKA seems to apply very neatly to the situation in this case." Id. The Court held that "in light of the AKA's broad mandate," liability cannot be avoided "simply because Garber and Arguin's kickback scheme was slightly more sophisticated and complex than the typical quid pro quo scenario." Id. The same can be said here, where the Government alleges another "more sophisticated and complex" kickback scheme against the Crown Defendants and their accomplices.

In United States ex rel. Compton v. Circle B Enterprises, Inc., the prime contractor--Circle B--had a contract with FEMA to build mobile homes for Hurricane Katrina refugees. No. 7:07-cv-32, 2010 WL 942293 (M.D. Ga. Mar. 11, 2010). Circle B lacked a license to build the mobile homes, so it gave subcontracts to various mobile-home builders to manufacture and deliver the mobile homes directly to FEMA. Id. at *2. In order to ensure the subcontractors would not squeeze out Circle B from its role as middle man, Circle B paid cash "rebates" to the subcontractors and their employees "in exchange for the subcontractors' promises that they would not sell mobile homes directly to the government." Id. Circle B and the other defendants asserted that the AKA did not apply, arguing that the AKA was only meant to cover "upstream," but not "downstream,"

9

payments. Id. at *11. The court rejected this argument, holding that "there is nothing in the statute that suggests payments from a prime contractor to a subcontractor cannot constitute kickbacks." Id.

The Crown Defendants also contend that the Government has not stated a claim under the AKA because subcontracts cannot constitute kickbacks. They specifically argue that "interpreting the definition of kickback to include the award of a subcontract would expand the definition well beyond what Congress intended."[13] Crown and Palmer are alleged to have paid kickbacks to USSE and Hattab in the form of three contracts awarded to USSE totaling in value $350,000, the proceeds of which the Government alleges were "split between Hattab and Shelmire."[14] These kickbacks were allegedly made in return for Hattab's and Shelmire's facilitation of "NASA's award of task orders to Crown valued at over $2.5 million" and "improper performance variances on several task orders."[15] The subcontracts fall within Congress's broad definition of kickbacks as "thing[s] of value." See 42 U.S.C. § 52(2). The Government's allegations of a scheme where subcontracts are the things of value that are given for the purpose of obtaining favorable treatment in government contracting sufficiently state a cause of action upon which relief

---

[13] Document No. 78 at 10.

[14] Id.

[15] Id. ¶ 24.

may be granted under the AKA. Accordingly, the Crown Defendants' motion to dismiss the Government's AKA claims will be denied.

IV. Common-Law Claims

The Crown Defendants assert that the Government's quasi-contract claims for unjust enrichment (Count XIII) and payment by mistake (Count XIV) are precluded because the parties had an express contract--the Master Contract.[16] This argument fails because the Government has pled facts from which it may be inferred that the Master Contract was void because it was tainted by fraud. See United States v. Acme Process Equip. Co., 87 S. Ct. 350, 355-56 (1966) (finding the government may rescind a contract tainted by kickbacks); United States v. Miss. Valley Generating Co., 81 S. Ct. 294, 317 (1961) (finding that government contracts tainted by fraud or wrong-doing are void *ab initio*); see also City of Harker Heights, Tex. v. Sun Meadows Land, Ltd., 830 S.W.2d 313, 317 (Tex. App.--Austin 1992, no writ) (stating that restitution is an appropriate remedy for breach of an implied, or quasi-contract where an agreement contemplated between parties is "unenforceable, impossible, not fully performed, thwarted by mutual mistake, or void for other legal reasons"). Moreover, "Government by appropriate action can recover funds which its agents have wrongfully,

---

[16] Document No. 78 at 11.

11

erroneously, or illegally paid." <u>United States v. Wurts</u>, 58 S. Ct. 637, 638 (1938) (citation omitted).

V. <u>Order</u>

For the foregoing reasons, it is

ORDERED that Defendant Crown Roofing Services, Inc.'s, Ray Palmer's, and R.D. Chatmon's Motion for Partial Dismissal (Document No. 78) is DENIED.

The Clerk will enter this Order, providing a correct copy to all parties of record.

SIGNED at Houston, Texas, on this 16TH day of March, 2011.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE